UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 10-20808-CR-JORDAN/O'SULLIVAN

UNITED STATES OF AMERICA,

     Plaintiff,

v.

DOUGLAS PUPO-REYNALDO,

     Defendant.

_____/

## REPORT AND RECOMMENDATION

THIS MATTER came before the Court on the Defendant's Motion to Suppress (DE# 27, 2/25/11). This motion was referred to United States Magistrate Judge John J. O'Sullivan by the Honorable Adalberto Jordan, United States District Court Judge for the Southern District of Florida. Having carefully considered the applicable filings and the law and having held an evidentiary hearing on May 17 and 18, 2011, the undersigned respectfully recommends that the Defendant's Motion to Suppress (DE# 27, 2/25/11) be **GRANTED in part and DENIED in part** for the reasons stated herein.

## BACKGROUND

The defendant, Douglas Pupo-Reynaldo, is charged with possession of a firearm and ammunition by a convicted felon. See Indictment (DE # 8, 11/9/10). On February 25, 2011, the defendant filed the instant motion. See Defendant's Motion to Suppress (DE# 27, 2/25/11). On March 14, 2011, the government filed the Government's Response and Incorporated Memorandum of Law in Opposition to Defendant's Motion to Suppress (DE# 29, 3/14/11). The defendant filed his reply on March 21, 2011. See

Defendant's Reply to Government's Response to Defendant's Motion to Suppress (DE# 30, 3/21/11). On May 4, 2011, the defendant filed the Defendant's Sealed Ex Parte Supplement to His Motion to Suppress (DE# 48, 5/4/11).[1] Pursuant to a Court Order the defendant disclosed section D of his sealed supplement to the government in the Defendant's Supplement to His Motion to Suppress (DE# 55, 5/11/11). The government filed its response on May 13, 2011. See The Government's Response in Opposition to Defendant's Supplement to His Motion to Suppress (DE# 59, 5/13/11).

On May 17 and18, 2011, the undersigned held an evidentiary hearing on the instant motion. Government's Exhibits 1 through 13 and Defendant's Exhibits 1 through 54, 55, 55A, 55B, 56 through 58 and 60 through 65 were admitted into evidence. Detective Yaniel Hernandez and Detective Robert Gonzalez testified on behalf of the government. The defendant presented testimony from Detective Freddy Trillo, Detective Joe Mendez, Officer Virginia Sander, Detective Rashad Adderly, Sergeant James Johns, Detective Janel Ruiz, Detective Steven Corley, Sergeant Charley Johnson, Sergeant Terrance Gontko, Detective Jason Gambill, Detective Scott Ogden and the defendant's common law wife Iraime Baguet.

## FACTS

On October 22, 2010, law enforcement officers with the Miami-Dade Police Department's STOP ("Street Terror Offender Program") unit began conducting an

---

[1] The Defendant's Sealed Ex Parte Supplement to His Motion to Suppress (DE# 48, 5/4/11) was unsealed at the end of the evidentiary hearing on May 18, 2011. The Court provided a copy of the Defendant's Sealed Ex Parte Supplement to His Motion to Suppress (DE# 48, 5/4/11) to the government before the parties presented closing arguments on the motion to suppress.

investigation into a suspected home invasion robbery. The officers had received

information[2] that an individual named "Douglas" (later identified as the defendant) and

several other individuals were planning to commit an armed home invasion robbery on

October 25, 2010. The officers conducted surveillance from October 22, 2010 until

October 25, 2010. They surveilled the victim's home and the defendant's residence, a

two-story townhouse located at 11205 S.W. 33rd Circle Place, Miami, Florida

(hereinafter "residence" or "defendant's residence").

After law enforcement officers had exhausted all other investigative techniques,

they decided to conduct a "knock and talk"[2] at the defendant's residence. The purpose

of the "knock and talk" was to make contact with the defendant and either confirm or

dispel the alleged home invasion robbery. The STOP unit was assisted by law

---

[2] At the evidentiary hearing, Detective Mendez testified that he had received information about a planned home invasion from "a source of information." Detective Mendez passed this information to the STOP unit. However, when Detective Mendez spoke to the defendant's counsel in April 2011, Detective Mendez stated he did not have contact with a confidential informant in relation to this case. Detective Mendez also spoke to the division counsel for the Drug Enforcement Administration ("DEA") with respect to a subpoena from the defendant's counsel regarding the instant case. Detective Mendez told the DEA division counsel that he did not know about a confidential informant in this case. At the evidentiary hearing, Detective Mendez explained that he initially told the defendant's counsel and the DEA division counsel that he did not know about a confidential informant in this case because Detective Mendez did not know who the defendant was. Detective Mendez also explained that to him the term "confidential informant" indicates an informant who is officially signed up with law enforcement. The undersigned does not need to make a credibility determination with respect to Detective Mendez's testimony because how law enforcement officers learned of the alleged home invasion robbery is not pertinent to whether the evidence against the defendant should be suppressed.

[2] A "knock and talk" is an investigatory technique utilized by law enforcement. During a "knock and talk" officers approach a residence where they believe a suspect is inside or a crime is allegedly being committed and attempt to have voluntary contact with persons inside the residence.

enforcement officers from the Robbery Intervention Detail ("RID") unit of the Miami-Dade Police Department. The officers set up a perimeter around the defendant's residence. The purpose of the perimeter was to prevent people from entering or leaving the area, for officer and public safety.

On October 25, 2010, at approximately 11:00 or 11:30 PM, Detective Yaniel Hernandez, Detective Steven Corley and Detective Scott Ogden approached the front door of the defendant's residence.[3] The detectives were wearing black police tactical vests with the words "police" on the front and back of the vests. The detectives firearms were holstered. Detective Hernandez and Detective Ogden were also displaying their police badges.

Detective Hernandez knocked on the front door of the defendant's residence. Approximately 15 seconds later, a woman, Iraime Baguet,[4] opened the door.[5] Detective

---

[3] Sergeant Johnson, Sergeant Ruiz, Sergeant Johns and Detective Gambill were also in the immediate vicinity of the defendant's front yard. Iraime Baguet is the defendant's common law wife. Ms. Baguet could not see the front yard from her livingroom.

[4] Ms. Baguet resides at this residence with the defendant and her children ages 20, 17, five and two. Ms. Baguet's 20 year-old-son was not at the residence on October 25, 2010.

[5] Ms. Baguet testified that her 17 year-old son opened the front door and let the officers in. According to Ms. Baguet, she was upstairs when she heard loud, rapid knocks. As she made her way downstairs, she heard the words "open the door, police department." When Ms. Baguet got to the livingroom approximately four or five officers were inside the residence. According to Ms. Baguet, the officers had their weapons drawn and were pointing at her and told her to sit down. The officers sat Ms. Baguet on a love seat next to her 17 year-old son. The officers asked Ms. Baguet if there were weapons or drugs inside the residence. Ms. Baguet responded that there were none. The officers asked how many people were inside the residence. Ms. Baguet responded that her two small children and her husband were also inside the residence. The officers asked for Ms. Baguet's husband's name and she responded that it was

Hernandez spoke to Ms. Baguet in Spanish. Detective Hernandez identified himself as a Miami-Dade police officer and asked to speak with the defendant. Ms. Baguet appeared calm and friendly. She invited the officers inside the residence. Detectives Hernandez and Ogden went inside the residence. Detective Corley remained at the entryway of the residence. The door remained opened.

Ms. Baguet called out to the defendant who was upstairs. Detectives Hernandez and Ogden were at the foot of the stairs when the defendant appeared at the top. The defendant was naked.[3] Detective Hernandez identified himself to the defendant as a Miami-Dade police officer and told the defendant he needed to talk to him. The defendant agreed to speak to Detective Hernandez and stated that he would go put some clothes on. Detective Hernandez did not have his weapon drawn at that point. Detective Hernandez allowed the defendant to leave his sight to put clothes on.

_____

"Douglas." The officers then called the defendant and the defendant responded. The defendant asked to be given a few minutes so he could put clothes over his underwear and according to Ms. Baguet, two or three officers ran up the stairs. The undersigned does not find Ms. Baguet's testimony credible. See United States v. Boulette, 265 Fed. Appx. 895, 898 (11th Cir. 2008) (citing United States v. Ramirez-Chilel, 289 F.3d 744, 749 (11th Cir. 2002) (noting that "[c]redibility determinations are within the province of the fact finder 'because the fact finder is in a better position than a reviewing court to assess the credibility of witnesses.'"). Ms. Baguet has a relationship with the defendant and has an interest in providing testimony that is favorable to the defense. Ms. Baguet also demonstrated a willingness to lie. At the evidentiary hearing, Ms. Baguet testified under oath that she lied for her children and would so again. She stated that she would lie for her children in any situation. The presence of the teenaged son is not relevant to the determination of this motion.

[3] Ms. Baguet testified that the defendant was wearing a white t-shirt and underwear. As previously noted, Ms. Baguet was not a credible witness. The undersigned credits the testimony of Detective Hernandez, Detective Corley, Sergeant Johnson and Detective Ogden, who consistently testified that the defendant was naked, over the testimony of Ms. Baguet. Additionally, Ms. Baguet acknowledged that the defendant sometimes sleeps naked.

Approximately 15 seconds later, Detective Hernandez heard a metal cling. Immediately

thereafter, Detective Hernandez heard someone on the radio stating: "He's coming out

of the house with guns."[4] Seconds later, Detective Ogden heard, either live or through a

radio communication, that the defendant was throwing guns out the window.[5] Detective

Hernandez also heard over the radio that the defendant was throwing guns out the

window.

Upon hearing the radio communication, Detective Hernandez and Detective

Ogden ran upstairs with their weapons drawn. Detective Ogden "cleared"[6] the first room

---

[4] The police department was unable to provide any radio recordings for this incident. Detective Gambill testified that Cynthia Willis with the Miami-Dade Police Department Communications Bureau told him that the radio transmissions concerning the incident were either erased or did not get recorded. Officer Virginia Sander with the Communications Bureau testified at the evidentiary hearing that she received a request for the radio communications involving the defendant from the Federal Public Defender's Officer. See Defendant's Exhibit 61. In a letter dated January 5, 2011 (the letter is incorrectly dated with the year 2010), Ms. Sander responded as follows: "After conducting a diligent search, the only recording found was the unit requesting a case number from the Complaint Desk. No audio was found on any radio frequencies. It does not appear that there were any problems with the recorders during that time." See Defendant's Exhibit 62.

[5] Sergeant Johns was stationed in the front of the defendant's residence. A few minutes after the officers went inside the residence with Ms. Baguet, he heard a radio communication that someone was attempting to jump out of the window of the residence. Minutes later, he heard someone opening the shutters on one of the second story windows at the front of the residence. He observed the defendant throw several firearms out of that window. Sergeant Ruiz was also stationed in front of the defendant's residence. He observed the defendant throw firearms out of the second story window. He advised on the radio that the defendant was disposing of firearms. Sergeant Ruiz remained in the front yard until the firearms were secured then went inside the defendant's residence. Sergeant Ruiz saw approximately four officers inside the residence.

[6] The term "clear" refers to an officer going inside a room and making sure no one is hiding inside it.

upstairs. After Detective Ogden cleared the first room, Detective Hernandez cleared the second room. There was a baby sleeping in a bed in the second room. Detective Corely found the defendant hiding inside the upstairs bathroom and took the defendant into custody.[7]

Detectives Robert Gonzalez and Rashad Adderly were assigned to the perimeter on October 25, 2010. Detectives Gonzalez and Adderly decided to cover the back of the defendant's residence. To reach the back of the residence, Detectives Gonzalez and Adderly went through a small side gate to the right of the front door of the defendant's residence. The side gate lead Detectives Gonzalez and Adderly to a driveway.[8] See Defendant's Exhibit 2. At the end of the driveway was a second small gate that led to a small concrete patio. See Defendant's Exhibit 6. Ms. Baguet's children played in this area. The family also used this patio area to play dominos.

From the patio area, Detective Gonzalez observed two windows on the second story of the defendant's residence. Detectives Gonzalez and Adderly climbed on a concrete wall[9] up to the roof and positioned themselves on the roof of the defendant's residence.[10] A few minutes later, Detectives Gonzalez and Adderly heard a second story

_____

[7] Detective Corley was at the entryway of the residence when he heard a radio communication with the words "gun" and "window." Upon hearing this radio communication, Detective Corely ran inside the residence and up the stairs with his firearm drawn.

[8] The defendant and Ms. Baguet sometimes used the driveway area to park cars. Ms. Baguet's children would also play in this area. See Defendant's Exhibit 2.

[9] The concrete wall separates the defendant's residence to the adjacent home.

[10] Detectives Gonzalez and Adderly testified that they were on the roof of the defendant's neighbor's home. The undersigned credits the statement contained in a

window open and observed the defendant lean out of the window carrying several firearms. Detective Gonzalez removed his gun from his holster and pointed the gun at the defendant. Detective Gonzalez ordered the defendant to drop the weapons. The defendant ducked back into the residence with the firearms. A couple of minutes later, Detectives Gonzalez and Adderly heard, either through a radio communication or by word of mouth, that the defendant had been taken into custody. Detectives Gonzalez and Adderly exited the roof through the second story window.

After the defendant was taken into custody, Detective Hernandez re-holstered his weapon. Detective Hernandez went downstairs and spoke to Ms. Baguet. At that point, Ms. Baguet was hysterical, very nervous and crying. She was worried about her children[11] who were sleeping upstairs. Detective Hernandez took Ms. Baguet upstairs to see her children. Detective Hernandez asked Ms. Baguet if she wanted to bring the baby downstairs. Ms. Baguet decided to leave the baby, who was still sleeping, upstairs. Detective Hernandez then took Ms. Baguet back to the first floor.

After seeing her children, Ms. Baguet was still nervous but calmer. Detective

---

report prepared by Detective Gonzalez on December 9, 2010 which states that Detectives Gonzalez and Adderly "took up a perimeter at the rear of the listed location on top of the terrace roof." See Government's Exhibit 13. The listed location refers to the defendant's residence. The Court credits the report over the testimony provided by Detectives Gonzalez and Adderly at the suppression hearing because the report was made closer in time – approximately a month and a half after the incident. Of note, the report used the word "terrace" which conveys an open structure or patio area. Thus, it is unlikely that Detective Gonzalez would have used the word "terrace" to describe the roof of the defendant's neighbor's home.

[11] Detective Hernandez testified only as to one child. However, Ms. Baguet testified that there were two children sleeping upstairs at the time the defendant was taken into custody.

Hernandez spoke to Ms. Baguet about obtaining her consent to search the residence. This conversation took place in Ms. Baguet's livingroom.[12] In addition to Detective Hernandez, there was one other officer in that area of the house.[13] Ms. Baguet immediately agreed to allow the officers to search the residence. After obtaining verbal consent from Ms. Baguet, Detective Hernandez went over the written consent to search form (Government's Exhibit 1) with her in Spanish. Ms. Baguet signed the consent to search form. Id.

The consent to search form signed by Ms. Baguet stated in part as follows:

WAIVER OF CONSTITUTIONAL RIGHTS: CONSENT TO SEARCH

BEFORE ANY SEARCH IS MADE, YOU MUST UNDERSTAND YOUR RIGHTS:

(1) You may refuse to consent to a search and may demand that a search warrant be obtained prior to any search of the premises or vehicle described below.

(2) If you consent to a search, anything of evidentiary value seized in the course of the search can be introduced into evidence in court.

_____

[12] Ms. Baguet testified that she signed the consent to search form in her sons' bedroom upstairs. According to Ms. Baguet she asked to see her children and an officer told her that she had to sign the consent to search form first. Ms. Baguet testified that she signed the consent to search form because the officers were already inside the residence and she had nothing to hide. According to Ms. Baguet, after she signed the consent to search form she was allowed to see her children. The agents then brought Ms. Baguet downstairs to the living room. Ms. Baguet also testified that she was handcuffed after she signed the consent to search form. Ms. Baguet sat in her living room for approximately 10 minutes. The officers then took off Ms. Baguet's handcuffs and took her to the back of the house and sat her down at a table to obtain a written statement from Ms. Baguet. See Government's Exhibit 3. The undersigned credits the officers' testimony over Ms. Baguet's testimony for the reasons stated in this Report and Recommendation.

[13] Detective Corely was the officer who witnessed Ms. Baguet's signature on the consent to search form. See Government's Exhibit 1.

I HAVE READ THE ABOVE STATEMENT OF MY RIGHTS AND I AM
FULLY AWARE OF THE SAID RIGHTS.

I HEREBY CONSENT TO A SEARCH WITHOUT WARRANT BY
OFFICERS OF THE MIAMI-DADE POLICE DEPARTMENT OF ALL
AREAS AND CONTENTS OF THE BELOW DESCRIBED PREMISES,
VEHICLE, VESSEL, OR AIRCRAFT.

[The form signed by Ms. Baguet listed the address of the defendant's
residence]

I HEREBY AUTHORIZE THE SAID OFFICERS TO SEIZE ANY ARTICLE
WHICH THEY MAY DEEM TO BE OF EVIDENTIARY VALUE.

THIS STATEMENT IS SIGNED OF MY OWN FREE WILL WITHOUT ANY
THREATS O[R] PROMISES HAVING BEEN MADE TO ME.

See Government's Exhibit 2 (capitalization in original).[14]

After Ms. Baguet signed the consent to search form, law enforcement officers

searched the residence. Law enforcement officers recovered several firearms,[15]

ammunition, bear spray, multiple masks and gloves from the defendant's residence.

---

[14] Government's Exhibit 2 is an English translation of the consent to search form
signed by Ms. Baguet.

[15] Detective Ogden was the officer who signed the property receipts for the
firearms and ammunition recovered from the defendant's residence. See Defendant's
Exhibits 63 and 64. One of the firearms recovered from the defendant's residence was
a Smith & Wesson, Model 36, revolver. The property receipt indicated a serial number
for this firearm. Id. The firearms and ammunition were later taken to the Bureau of
Alcohol, Tobacco, Firearms and Explosives ("ATF"). ATF Special Agent Tamara L.
VanVliet prepared the nexus report on the firearms and ammunition in the instant case.
See Defendant's Exhibit 65. A nexus report establishes where a firearm or ammunition
is manufactured for purposes of establishing that the item traveled in interstate
commerce in order to satisfy the federal nexus requirement. The nexus report in the
instant case indicated that the Smith & Wesson, Model 36, revolver had its "[s]erial
[n]umber obliterated." Id. The government has explained that the officer who wrote the
"serial number" on the property receipt used a number that he thought was a serial
number but was actually not the serial number. Ms. VanVliet, an expert on the
origination and identification of firearms, determined that there was no serial number for
this firearm.

10

Detective Hernandez also obtained a written statement from Ms. Baguet. See

Government's Exhibit 3. The written statement was obtained on October 26, 2010 at

1:00 AM. Id. In the written statement, Ms. Baguet stated the following:

> The police came to my house, and I granted them permission to enter.
> When they entered, my boyfriend, Douglas Pupo, started to throw the guns
> from the second floor. I had no idea that the guns were there in my house.
> It's been a month only that he has been living with me. I only know him for
> three months. I met him at work at a restaurant on 72nd Avenue and
> southwest 40th Street.
>
> Before the police came to my house, he was here with some friends . . .
> and the police found two boxes of bullets. I explain[ed] that the ex-girlfriend
> had brought them with her belongings. Her name is Di[gs]mar[y] . . . and
> the guns were in her house and they are not mine.

Transcript (DE# 66 at 44-45, 5/27/11).[16] The written statement (Government's Exhibit 3)

states that it was made under penalty of perjury and was signed by Ms. Baguet. Id. At no

time did law enforcement officers threaten, make promises to or point guns at Ms.

Baguet.[17]

---

[16] The written statement, Government's Exhibit 3, is in Spanish. At the
evidentiary hearing, the undersigned asked the interpreter to translate the statement to
English. The interpreter later translated the second portion of Ms. Baguet's written
statement as follows: "The police found two boxes of bullets, and I explained to them
that the ex-girlfriend had brought them along with her personal belongings. Her name is
Di[gs]mar[y] . . . and **the guns were in the house**, but they are not mine. The guns that
were in the house are not mine." Transcript (DE# 66 at 48, 5/27/11) (emphasis added).

[17] According to Ms. Baguet, the officers told her that if she did not cooperate the
officers were going to contact child protective services and take her children away.
According to Ms. Baguet, an officer gave her a paper (Government's Exhibit 3) and told
her what to write. Ms. Baguet testified that she lied in her written statement
(Government's Exhibit 3) because she was afraid of losing her children. Ms. Baguet
also testified that the officers even called her brother so that her brother could come
take her children. The undersigned credits the testimony of the officers over the
testimony of Ms. Baguet. Ms. Baguet's written statement contains specific details about
her life with the defendant including the name of the defendant's ex-girlfriend and how
she and the defendant met. These facts would not have been known to Detective

## ANALYSIS

The defendant asserts that law enforcement officers forcefully entered his residence and conducted a warrantless search. The defendant further argues that the consent obtained from Ms. Baguet was not voluntary. The government maintains that Ms. Baguet invited the officers inside the residence and that the search of the residence was made pursuant to a valid consent.

**A.    Knock and Talk**

The Fourth Amendment protects individuals from unreasonable searches and seizures by the government. United States v. Taylor, 458 F.3d 1201, 1204 (11th Cir. 2006). The Fourth Amendment "is not implicated by entry upon private land to knock on a citizen's door for legitimate police purposes unconnected with a search of the premises." Id. (citing Coolidge v. New Hampshire, 403 U.S. 443, 466 (1971)). In the instant case, the officers' initial contact with Ms. Baguet was a knock and talk. "Absent express orders from the person in possession, an officer may walk up the steps and knock on the front door of any man's [home], with the honest intent of asking questions of the occupant thereof." Taylor, 458 F.3d at 1204 (quoting Davis v. United States, 327 F.2d 301, 303 (9th Cir. 1964)) (internal quotation marks omitted). The undersigned credits Detective Hernandez and Detective Ogden's testimony that Ms. Baguet invited the detectives inside the residence. Thus, Detective Hernandez and Detective Ogden's initial entry onto the defendant's property was lawful.

--------

Gonzalez. Additionally, the testimony of Ms. Baguet was uncorroborated and there were other individuals – Ms. Baguet's 17 year-old son and her brother – who could have corroborated her testimony.

The defendant argues that the officers' subjective intent upon approaching the defendant's residence is relevant. The defendant relies on United States v. Rodriguez, No. 1:08cr32-SPM, 2009 WL 762203 (N.D. Fla. Mar. 18, 2009). In Rodriguez, the district court granted a motion to suppress where it found that the officers' entry onto the defendant's property was not justified by the "knock and talk" exception to the warrant requirement. Id. at *7. Specifically, the district court concluded that "[i]f the officers intrude upon curtilage, without a warrant, in the absence of exigent circumstances, for the 'purpose of conducting a search for criminal activity,' then that search is improper." Id. (citing United States v. Williams, 581 F.2d 451, 453 (5th Cir. 1978)).[18] The district court in Rodriguez recognized that "[t]ypically, officers are allowed to knock on a residence's door or otherwise approach a residence seeking to speak to the inhabitants just as any private citizen may." Id. at *8 (citing Taylor, 458 F.3d at 1204) (internal citation and quotation marks omitted)). What put the Rodriguez case outside the "knock and talk" exception was that:

> a private citizen would not be expected to jump over a fence or force or deactivate a closed electronic gate to gain access to Defendant's house. A decision to erect a gate and post a "Beware of Dogs" sign manifests an intent on the part of the homeowner to exclude strangers by sealing the property around his or her home. When this intent is apparent and the expectation of privacy is clear, the police are not legally to enter this area of private property without a warrant or exigent circumstances. The act of sealing off this area with a fence creates an elevated expectation of privacy. **When investigating without formal process, the police are not allowed to do more than what any private citizen may legitimately do, and a private citizen may not legitimately jump over the perimeter fence or dismantle a secured gate of a private home owner, evading**

---

[18] The Eleventh Circuit in Bonner v. City of Prichard, 661 F. 2d 1206, 1207 (11th Cir. 1981) (en banc), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

**dogs in the process, and walk up to the doorway.**

Id. at *8. Here, the officers' actions in walking up to the defendant's residence and

knocking on the door did not exceed what a private citizen may legitimately do.

Accordingly, the undersigned finds that the Rodriguez case is distinguishable from the

facts of the instant case.

**B.      Search of the Residence**

"[G]eneral[ly,] . . . warrantless searches are per se unreasonable under the Fourth

Amendment-subject only to a few specifically established and well-delineated

exceptions." United States v. Gonzalez, 71 F.3d 819, 825 (11th Cir.1996) (quotations

omitted). "[I]t is well settled that one of the specifically established exceptions to the

requirements of both a warrant and probable cause is a search conducted pursuant to

consent to search." Id. at 827. The government has the burden of proving that consent

to search was given voluntarily, as an independent act of free will and not mere

acquiescence to police authority. Florida v. Royer, 460 U.S. 491 (1983). To be

considered voluntary, a consent to search must be the product of an essentially free and

unconstrained choice. United States v. Garcia, 890 F.2d 355, 360 (11th Cir. 1989).

Whether consent was in fact voluntary or a product of express or implied duress or

coercion is to be determined by the totality of the circumstances. United States v.

Mendenhall, 446 U.S. 544 (1980).

The search of the defendant's residence was valid as Ms. Baguet had authority[19]

---

[19] A search conducted without a warrant is valid if an authorized person
consents. Schenckloth v. Bustamante, 412 U.S. 218, 222 (1972). Anyone who
possesses common authority over or other sufficient relationship to a premises may
consent to the search of another's property. Lenz v. Winburn, 51 F.3d 1540, 1548 (11th

14

and voluntarily consented to the search of the residence. Here, the totality of the circumstances demonstrate that Ms. Baguet voluntarily consented to the search of the defendant's residence. Detective Hernandez' testimony that Ms. Baguet verbally consented to the search and signed a consent to search form (Government's Exhibits 1 and 2) was credible. There is no credible evidence that the officers used any coercive tactics to induce consent. Ms. Baguet was not constrained in any manner. The officers made no threats to Ms. Baguet and did not have their guns drawn at the time she gave the verbal consent and when she signed the written consent. At one point, Ms. Baguet testified that she signed the form because she did not think there were drugs or firearms in the house. Ms. Baguet voluntarily permitted the officers to search the residence.

The facts in the instant case are less coercive that those in Garcia, 890 F.2d at 355 at 360 (11th Cir. 1989), where the Eleventh Circuit, found a defendant's consent to be voluntary when the defendant was arrested in the front yard of his house by fourteen law enforcement agents, and then taken inside after the agents conducted a "protective sweep" of the house. The defendant in Garcia was handcuffed when he gave the agents consent to search the house. The Eleventh Circuit noted that it had approved consent given under "far more coercive conditions" and stated, "we cannot conclude that these factors caused [the defendant]'s consent to become involuntary." Id. at 362. In this case, Ms. Baguet understood the consent form and voluntarily permitted the officers to search the residence.

---

Cir. 1995). A third party with common authority over a house may consent to a search obviating the need for a search warrant. United States v. Matlock, 415 U.S. 164, 171 (1974). Here, the defendant does not contest Ms. Baguet's authority to allow officers to search the residence.

15

### C.    Rooftop Observations

Although the undersigned finds that Ms. Baguet invited law enforcement officers inside the defendant's residence and voluntarily consented to the search of residence, observations made by Detectives Gonzalez and Adderly while on the rooftop of the defendant's terrance must be suppressed. The detectives' access to the rooftop of the defendant's residence was not permissible. United States v. Taylor, 458 F.3d 1201, 1204 (11th Cir. 2006) (officers are permitted to approach a residence in the same manner as any private citizen would approach a residence). Detectives Gonzalez and Adderly observed the defendant attempting to dispose of firearms from the second story window at the back of the residence. At the time, Ms. Baguet had not yet provided consent to search the residence. Accordingly, the undersigned recommends that these observations be suppressed.

### **RECOMMENDATION**

For the foregoing reasons, the undersigned RECOMMENDS that the Defendant's Motion to Suppress (DE# 27, 2/25/11) be **GRANTED in part and DENIED in part**. The undersigned respectfully recommends that the observations made by law enforcement while on the defendant's roof should be suppressed. The remaining evidence should not be suppressed. Pursuant to 28 U.S.C. § 6363(b)(1)(B) and (C), the parties may serve and file written objections to this Report and Recommendation with the Honorable Adalberto Jordan within fourteen (14) days of receipt of a copy of this Report and

16

Recommendation. See Nettles v. Wainwright, 677 F.2d 404 (5th Cir. 1982).

RESPECTFULLY SUBMITTED in Chambers, at Miami, Florida, this **6th** day of June, 2011.

_____
JOHN J. O'SULLIVAN
UNITED STATES MAGISTRATE JUDGE

Copies to:
United States District Judge Jordan
All counsel of record

17